Argued and submitted September 23, 2020; decision of Court of Appeals reversed, judgment of circuit court reversed, and case remanded to circuit court for further proceedings February 11, 2021

THE BANK OF NEW YORK MELLON
TRUST COMPANY, NATIONAL ASSOCIATION,
fka The Bank of New York Trust Company, N.A.,
as successor to JPMorgan Chase Bank,
as Trustee for Residential Asset Mortgage Product, Inc.,
Mortgage Asset-Backed Pass Through Certificates,
Series 2003-RS5,
*Respondent on Review,*

*v.*

Zahid SULEJMANAGIC et al.,
*Defendants,*

*and*

TANGLEWOOD HILLS
CONDOMINIUM ASSOCIATION,
*Petitioner on Review.*

(CC CV13071012) (CA A163269) (SC S067155)

481 P3d 293

Plaintiff Bank of New York Mellon Trust Company (bank) had filed a civil action to foreclose a deed of trust on a condominium unit. Defendant Tanglewood Hills Condominium Association (Tanglewood) had a lien against the same unit for condominium assessments that had not been paid by the owner. After the bank's foreclosure action had been dismissed, Tanglewood gave notice of its lien under ORS 100.450(7). More than 90 days later, the bank later had the foreclosure action reinstated. Tanglewood contended that, under ORS 100.450(7), its lien took priority over the bank's interest because the bank "ha[d] not initiated" a foreclosure action within 90 days, ORS 100.450(7)(c). The trial court rejected Tanglewood's argument and granted summary judgment for the bank. The Court of Appeals affirmed. *Held*: (1) A condominium association's proper notice under ORS 100.450(7)(a) triggers an obligation on a first lienholder to act within 90 days, or the condominium association's lien will take priority; (2) the bank here did not act before the 90 days expired; (3) the bank could not rely on its previously filed foreclosure action, as that action had been dismissed by general judgment prior to Tanglewood's notice, and the action remained dismissed throughout the entire 90-day period; and (4) once the 90 days had elapsed without the case being reopened or a new foreclosure action being filed, Tanglewood was granted priority over the bank's interest by operation of ORS 100.450(7).

The decision of the Court of Appeals is reversed. The judgment of the circuit court is reversed, and the case is remanded to the circuit court for further proceedings.

En Banc

On review from the Court of Appeals.*

Ryan D. Harris, Vial Fotheringham LLP, Lake Oswego, argued the cause and filed the briefs for petitioner on review.

John Thomas, McCarthy Holthus, LLP, Portland, argued the cause and filed the brief for respondent on review.

NELSON, J.

The decision of the Court of Appeals is reversed. The judgment of the circuit court is reversed, and the case is remanded to the circuit court for further proceedings.

_____

* On appeal from Clackamas County Circuit Court, Michael C. Wetzel, Judge. 299 Or App 261, 450 P3d 14 (2019).

**NELSON, J.**

This case involves the relative priority of liens against a condominium unit. Plaintiff Bank of New York Mellon Trust Company (bank) held a deed of trust to the unit, while defendant Tanglewood Hills Condominium Association (Tanglewood) had a lien for condominium assessments that had not been paid by the owner. Although the bank's lien would ordinarily take priority, Tanglewood contended that its lien gained priority under ORS 100.450(7), because the bank "ha[d] not initiated" a foreclosure action during a 90-day notice period prescribed by that statute. The trial court rejected Tanglewood's argument and granted summary judgment for the bank. The Court of Appeals affirmed. *Bank of New York Mellon Trust Co. v. Sulejmanagic*, 299 Or App 261, 450 P3d 14 (2019). On review, we reverse.

## I.  FACTS

When a condominium association has unpaid assessments against a condominium unit, the association may record and perfect a lien against the unit for those assessments under ORS 100.450(1) and (2). In general, the lien has priority over all other liens, except tax liens and a first mortgage or deed of trust. *See* ORS 100.450(1)(a), (b). In limited circumstances, however, the condominium association can also gain priority over the holder of the first mortgage or deed of trust: if (among other things) the association gives the first lienholder formal notice of the unpaid assessments, and the lienholder "has not initiated judicial action to foreclose the mortgage *** prior to the expiration of 90 days following the notice[.]" ORS 100.450(7)(c). This case requires us to determine whether the association gains priority over a first lienholder whose foreclosure action had been filed and dismissed before the notice period starts.

The facts relevant to the issue presented here are essentially undisputed. The condominium unit at issue had been purchased by Zahid Sulejmanagic in 2003. Sulejmanagic gave a note to the bank's predecessor-in-interest, secured by a properly recorded deed of trust on the unit. Sulejmanagic began failing to make payments on the note in 2011.

As a condominium, the unit was also subject to regular assessments by Tanglewood. In 2013, Sulejmanagic began failing to pay those assessments. Tanglewood recorded a lien against the condominium unit for the missing assessments on July 25, 2013, as it was permitted to do by ORS 100.450(2). It is undisputed that Tanglewood's lien was junior to the bank's interest, at least at that time. *See* ORS 100.450(1)(b) (lien of condominium association is generally not prior to "first mortgage or trust deed of record").

Five days after Tanglewood recorded its lien—on July 30, 2013—the bank filed a judicial foreclosure action against Sulejmanagic, a different homeowners' association, and "all other persons" having an interest in the condominium unit. Tanglewood was not specifically named as a party to that action. On December 11, 2013, the bank and Sulejmanagic entered into a stipulated limited judgment of foreclosure against Sulejmanagic alone. Because Tanglewood, a junior lienholder, had not been named in the action, the stipulated limited judgment of foreclosure against Sulejmanagic alone would not have terminated Tanglewood's lien on the property or otherwise affected the relative priorities and rights as between the bank and Tanglewood.[1]

---

[1] See *Portland Mortgage Co. v. Creditors Protective Ass'n*, 199 Or 432, 262 P2d 918 (1953), explaining that a completed foreclosure action that omits a junior lienholder does not change the relative rights as between the foreclosing party and the omitted lienholder:

"The omitted junior lienholder is in the same position as if no foreclosure had ever taken place, and he has the same rights, no more and no less, which he had before the foreclosure suit was commenced. * * *

"Just as the omitted junior lienholder retains the rights he had in the property subject to the lien, so the senior mortgagee retains rights with respect to the junior lienholder which are the equivalent of those held by him before the foreclosure of his mortgage."

199 Or at 440 (citations omitted). *See also Erne v. Goshen Veneer, Inc.*, 249 Or 357, 362, 437 P2d 479 (1968) (quoting *Portland Mortgage*); Cody Hoesly, "Mortgage Foreclosure," 2 *Oregon Real Estate Deskbook* § 24.3-3(b)(4), 24-31 (2015) (omission of junior lienholder "does not invalidate a foreclosure judgment or sale, but it does render the junior lienholder unaffected by the judgment and sale; the junior lienholder retains his or her lien, right to foreclose that lien, and equity of redemption" (citations omitted)).

For that reason, an Oregon commentator described a foreclosure action that omitted a junior lien as creating a "Dracula" mortgage:

"[T]he * * * macabre effect of such a defective foreclosure [is]: the mortgage is foreclosed and forever dead with respect to the mortgagor, the foreclosing

Early the next year (January 2014), the bank filed a first amended complaint for judicial foreclosure. This amended complaint specifically named Tanglewood as a party, a necessary step if Tanglewood's claims on the property were to be extinguished by the foreclosure.

On May 16, 2014, the trial court entered a general judgment of dismissal as to Tanglewood. The dismissal, pursuant to UTCR 7.020 for failure to prosecute, was without prejudice. *See* ORS 18.082(5).

On or about October 1, 2014, Tanglewood sent the bank written notice of Sulejmanagic's default on assessments under the provisions of ORS 100.450(7).[2] Pursuant to that statute, the bank had to have "initiated" a foreclosure proceeding on or before 90 days following the notice—that is, on or about January 1, 2015—for the bank to retain its lien priority over Tanglewood. It is undisputed that the bank took no action during that 90-day period, either to reinstate its previously-dismissed foreclosure action, or to file a new one.

It was not until May 4, 2015, that the bank first moved for the trial court to reinstate the foreclosure action. The trial court ultimately granted the motion. Tanglewood answered the complaint and asserted that it now had priority over the bank pursuant to ORS 100.450(7).

Tanglewood and the bank would later move for summary judgment (albeit at different times). Tanglewood argued that the bank's foreclosure action was not effective to give it priority over Tanglewood's lien, either because the action had been filed before Tanglewood gave notice under

---

party, and all junior lienholders who are joined at the foreclosure action as parties defendant. Yet, the same mortgage lives on as if no foreclosure occurred with respect to any omitted junior lienholder whose interest is of record. Hence, simultaneously, the mortgage is both alive and dead. \*\*\* [I]t is a living cadaver which the foreclosure sale purchaser acquires and must cart around on a life support system for the benefit of any omitted junior interest as long as the omitted interest remains outside foreclosure."

George M. Platt, *The Dracula Mortgage: Creature of the Omitted Junior Lienholder*, 67 Or L Rev 287, 287 (1988) (footnote omitted).

[2] The notice was sent to the bank's predecessor-in-interest rather than the bank itself, but the parties do not argue that that is of any legal significance to our analysis.

ORS 100.450(7), or because the dismissed action had not been reinstated before the 90-day notice period expired. The bank asserted that the statute only required it to "initiate" a foreclosure action; it had done so; and, therefore, Tanglewood could not obtain priority.

The trial court agreed with the bank. It granted summary judgment, and later entered a general judgment of foreclosure.

Tanglewood appealed, renewing its argument that it was entitled to priority. The Court of Appeals rejected the argument and affirmed. *Bank of New York*, 299 Or App at 263. The court first rejected Tanglewood's assertion that the foreclosure action had to be filed *after* a condominium association had given notice under ORS 100.450(7)(c). The bank's foreclosure action had been filed "prior to" the expiration of the 90-day notice period, as was required by the plain text of the statute. *See* 299 Or App at 269.

The court also rejected Tanglewood's alternative argument that the foreclosure action was ineffective to preserve the bank's priority because the action had been dismissed before Tanglewood gave formal notice and remained dismissed during the entire 90-day notice period. The statute said nothing about the "status of any judicial action," the court concluded; if a foreclosure action had been initiated, then the requirements of ORS 100.450(7)(c) were met. 299 Or App at 268.

Tanglewood sought review, which we allowed.

## II.   DISCUSSION

The issue presented here involves how the Oregon legislature has balanced the complicated interplay between the interests of condominium associations and first lienholders. Before turning to the specifics of how this state has addressed the issue, it will be useful to provide some background about the concerns that underlie this question. (As we will explain shortly, the text, context, and legislative history of ORS 100.450(7) reflect many of the same concerns identified nationally.)

A.  *Overview of National Debate on Condominium Associa-
    tion Priority for Unpaid Assessments*

For decades, there has been extensive commen-
tary nationally regarding the appropriate priority that
should be given to condominium association assessments.
*See, e.g.*, Stewart E. Sterk, *Maintaining Condominiums and
Homeowner Associations: How Much of a Priority?*, 93 Ind
LJ 807 (2018); Andrea J. Boyack, *Community Collateral
Damage: A Question of Priorities*, 43 Loy U Chi LJ 53 (2011);
Daniel Goldmintz, *Lien Priorities: The Defects of Limiting
the "Super Priority" for Common Interest Communities*,
33 Cardozo L Rev 267 (2011); James L. Winokur, *Meaner
Lienor Community Associations: The "Super Priority" Lien
and Related Reforms under the Uniform Common Interest
Ownership Act*, 27 Wake Forest L Rev 353 (1992); Henry
L. Judy & Robert A. Wittie, *Uniform Condominium Act:
Selected Key Issues*, 13 Real Property, Probate & Trust J 437
(1978). The Uniform Law Commission has addressed the
issue at least twice, first in the Uniform Condominium Act
(1978), then in the Uniform Common Interest Ownership
Act (1982). *See* Sterk, 93 Ind LJ at 815.[3]

In brief, the problem is a conflict between compet-
ing interests. On the one hand, a condominium association
imposes assessments on the unit owners so as to maintain
the public spaces and other amenities of the units. If one unit
owner is not paying those assessments, then an increased
burden falls on the other unit owners, who must make up
the shortfall through increased assessments. A shortfall
in assessments can also harm the value of all the condo-
minium units, in that necessary maintenance and upkeep
may not be done. *See* Boyack, 43 Loy U Chi LJ at 61-62,
102 n 249; Judy & Wittie, 13 Real Property, Probate & Trust
J at 474-75.

On the other hand, the first lienholder for a con-
dominium unit is typically a bank or other lender who had
financed the owner's purchase of the unit. Laws that impair
the value of the lender's security will impair lending itself,
making condominium units more difficult to build, sell, and

---

[3] Neither uniform act has been adopted in Oregon.

resell. That, in turn, harms the value of condominiums generally. *See* Report of the Joint Editorial Board For Uniform Real Property Acts, *The Six-Month "Limited Priority Lien" for Association Fees Under the Uniform Common Interest Ownership Act*, 2 (June 1, 2013) (online at https://www.uniformlaws.org/viewdocument/jeb-urpa-report-the-six-month-li) (accessed Feb 2, 2021); Winokur, 27 Wake Forest L Rev at 359; Judy & Wittie, 13 Real Property, Probate & Trust J at 476.

The situation becomes most problematic when property values are falling, often because of a poor economy. The first lienholder has a positive incentive not to foreclose, as "a lender purchasing at foreclosure will be liable for all subsequent assessments," while holding a property that may take a substantial time to resell. Boyack, 43 Loy U Chi LJ at 103; *see also* Goldmintz, 33 Cardozo L Rev at 281 ("[E]ven in the best of times, lenders may move slowly to foreclose on the property since they then become immediately liable for assessment payments." (Footnote omitted.)). A lienholder who delays foreclosure, by contrast, gives the market time to go back up without becoming liable for the assessments in the meantime. *See* Goldmintz, 33 Cardozo L Rev at 281-82 (explaining some first lienholder incentives); *see also* Boyack, 43 Loy U Chi LJ at 103 (same). At the same time, the poor economy may mean that more of the unit owners are in default on the assessments, imposing substantial financial burdens on the remaining unit owners while endangering the solvency of the condominium association itself. *See* Boyack, 43 Loy U Chi LJ at 60-61; Goldmintz, 33 Cardozo L Rev at 282.

Various solutions have been proposed over the decades. The Federal Housing Administration's model condominium act in 1962 provided that condominium assessments had priority over all liens except first liens (and tax liens). *See* Sterk, 93 Ind LJ at 813 (discussing Federal Housing Administration, Form No. 3825, Apartment Ownership Act (1962)). The Uniform Condominium Act and the Uniform Common Interest Ownership Act both gave condominium assessments a "super priority" over first liens—but limited it to six months' worth of unpaid assessments. *See id*. at 815. Another proposed solution has been to give a condominium

association a super priority over first liens for all amounts of unpaid assessments. *See id.* at 809-10 (so arguing).

B. *Oregon's Legislative Solution: ORS 100.450*

With that background, we turn to the legislative solution adopted in Oregon. The dispute in this case involves the relative priority of liens under ORS 100.450. That statute consists of two parts: a general rule and a specific exception.

The general rule is that, while a condominium association's lien will take priority over a number of other liens automatically, it does not take priority over a first mortgage:

> "The lien is prior to a homestead exemption and all other liens or encumbrances upon the unit except:
>
> "* * * * *
>
> "(b)  A first mortgage or trust deed of record[.]"

ORS 100.450(1)(b) (excluding certain exceptions not relevant here). It is not disputed that the bank's interest is a first trust deed of record.

The statute goes on to provide that, when certain limited conditions are met, a condominium association lien will obtain priority over a first mortgage or deed of trust:

> "(7)  Notwithstanding the priority established for a lien for unpaid assessments and interest under subsection (1) of this section, the lien shall also be prior to the lien of a first mortgage or trust deed of record for the unit and the undivided interest in the common elements, if:
>
> "(a)  The association of unit owners for the condominium in which the unit is located has given the lender under the mortgage or trust deed 90 days prior written notice that the owner of the unit is in default in payment of an assessment. * * *
>
> "* * * * *
>
> "(c)  The lender has not initiated judicial action to foreclose the mortgage or requested issuance of a trustee's notice of sale under the trust deed or accepted a deed in lieu of foreclosure in the circumstances described in ORS

100.465 prior to the expiration of 90 days following the notice by the unit owners' association."

ORS 100.450(7).[4]

The dispute here concerns whether ORS 100.450(7) gave Tanglewood's lien priority over the bank's lien. Specifically, the issue turns on what ORS 100.450(7)(c) means when it requires a foreclosure action to be filed "prior to the expiration of 90 days following the notice."

Tanglewood presents two arguments. Its first contention is that ORS 100.450(7)(c) requires a lender to act, not just before a date, but after a date—specifically, after the date of the condominium association's notice. There is no question that the statute sets an end date: The lender must act no later than 90 days after the notice, or it will lose priority to the condominium association. Tanglewood contends that the statute also sets a start date, and that any foreclosure action initiated by the lender prior to the condominium association's notice will be ineffective to stop the association from taking priority.

Alternatively, Tanglewood maintains that the bank's foreclosure action failed to meet the requirements of ORS 100.450(7)(c) because the action was dismissed at the time Tanglewood gave notice, and the bank took no steps to reinstate it during the 90-day notice period.

For its part, the bank responds that ORS 100.450 (7)(c) does not set a start date. The statute applies only when a lender "has not initiated" the foreclosure action. Here, it notes, it had already initiated the foreclosure action when Tanglewood sent its notice. As for Tanglewood's alternative argument, the bank asserts that nothing requires the foreclosure action to remain pending during the notice period. Accordingly, the bank contends, Tanglewood has not gained priority for its lien.

To resolve the issue, we must determine the legislative intent behind ORS 100.450(7)(c). In doing so, we consider

---

[4] There are other requirements for a condominium association to obtain priority over a first mortgage, but it is not disputed that those conditions have been met in this case.

the text, context, and any relevant legislative history under the methodology articulated in *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610-12, 859 P2d 1143 (1993), and *State v. Gaines*, 346 Or 160, 171-72, 206 P3d 1042 (2009).

    1.   *Text*

Beginning with the text, a condominium association's lien will take priority over the first lien only if:

> "The lender has not initiated judicial action to foreclose the mortgage[5] * * * prior to the expiration of 90 days following the notice by the unit owners' association."

ORS 100.450(7)(c).

Tanglewood relies on the particular phrasing of that subsection, asserting that the words "following the notice" should be read to set a start date for when the lender must initiate the foreclosure proceeding. That is, Tanglewood reads that text to require that the foreclosure action be initiated "following the notice" by the condominium association under ORS 100.450(7).

Strictly speaking, the phrase "following the notice" does not support Tanglewood's contention. What must "follow[] the notice" is "90 days." The entire final clause is a calculation method: Take the notice date and add 90 days to determine what the statute denominates as the "expiration" date.

The text provides that something must occur "prior to the expiration" of the defined date. The phrase "prior to" is defined to mean "in advance of : BEFORE." *Webster's Third New Int'l Dictionary* 1804 (unabridged ed 2002). "Prior to" is here used as a prepositional phrase, the object of which is the "expiration [of 90 days following the notice]." "Prior to" means only before; it does not limit how long before.

The text thus provides for an expiration date, and it requires courts to determine whether certain events have occurred "prior to" that expiration date. One such event is

---

[5] At oral argument, it was noted that this case involved judicial foreclosure of a deed of trust rather than a mortgage. The parties do not argue that that fact is relevant to our analysis.

whether the first lienholder has "initiated judicial action to foreclose the mortgage." ORS 100.450(7)(c). The relevant definition of "initiate" is "to begin or set going : make a beginning of : perform or facilitate the first actions, steps, or stages of." *Webster's* at 1164.[6]

The text alone, then, is unclear regarding the time by which the first lienholder must act. It defines only the end of the action period.

### 2.  *Context*

We must evaluate the statutory text in its context. Here, Tanglewood is on firmer ground. The first lienholder must act before the 90-day period expires, but the clear expectation of the statute is that the first lienholder's action will be prompted by the notice itself.

ORS 100.450(7) as a whole sets out extensive requirements by which a condominium association's lien for unpaid assessments can obtain priority over a first lienholder. The relevant provisions of ORS 100.450(7) are as follows:

"Notwithstanding the priority established for a lien for unpaid assessments and interest under subsection (1) of this section, the lien shall also be prior to the lien of a first mortgage or trust deed of record for the unit and the undivided interest in the common elements, if:

"(a)  The association of unit owners for the condominium in which the unit is located has given the lender under the mortgage or trust deed 90 days prior written notice that the owner of the unit is in default in payment of an assessment. The notice shall contain:

"(A)   Name of borrower;

---

[6] We are unpersuaded by Tanglewood's reliance on *Welker v. TSPC*, 332 Or 306, 27 P3d 1038 (2001), which interpreted different text and context. In that case, this court had interpreted a statute requiring a notice of appeal to be filed "'within 30 days after'" a motion for new trial was resolved, *id*. at 311 n 2 (quoting *former* ORS 19.026(2) (1995)), and the court concluded that the notice of appeal could not be filed before the motion had been resolved. The court explained that time to file an appeal does not start until either the trial court rules on the new trial motion or the motion is deemed denied. *Id*. at 312. Prior case law—which is statutory context—had expressly held that a premature notice of appeal was "jurisdictionally defective." *Id*. at 312-13. The notice of appeal thus had to be filed "within"—that is, inside the boundaries of—the 30-day period.

"(B)  Recording date of trust deed or mortgage;

"(C)  Recording information;

"(D)  Name of condominium, unit owner and unit designation stated in the declaration or applicable supplemental declaration; and

"(E)  Amount of unpaid assessment.

"(b)  The notice under paragraph (a) of this subsection shall set forth the following in 10-point type:

"
_____

"NOTICE: The lien of the association may become prior to that of the lender pursuant to ORS 100.450.

"
_____

"(c)  The lender has not initiated judicial action to foreclose the mortgage or requested issuance of a trustee's notice of sale under the trust deed or accepted a deed in lieu of foreclosure in the circumstances described in ORS 100.465 prior to the expiration of 90 days following the notice by the unit owners' association.

"(d)  The unit owners' association has provided the lender, upon request, with copies of any liens filed on the unit, a statement of the assessments and interest remaining unpaid on the unit and other documents which the lender may reasonably request.

"(e)  The borrower is in default under the terms of the mortgage or trust deed as to principal and interest.

"(f)  A copy of the notice described in paragraph (a) of this subsection, together with an affidavit of notice by a person having knowledge of the facts, has been recorded in the manner prescribed in subsection (3) of this section. The affidavit shall recite the date and the person to whom the notice was given."

In summary, the statute imposes an initial set of obligations on the condominium association, which must give 90 days' written notice to the first lienholder that the owner is in default on the assessments. ORS 100.450(7)(a). If the condominium association does so (and if the owner is in default on the first mortgage or deed of trust, ORS 100.450(7)(e)), then the burden for action shifts to the first

lienholder. The first lienholder now has 90 days to take one of the actions specified by ORS 100.450(7)(c). If the first lienholder does not do so, then it loses its first priority to the lien for unpaid assessments.

In context, the 90-day period in ORS 100.450(7)(c) is the same 90 days mentioned in ORS 100.450(7)(a) in connection with the written notice. The notice triggers the first lienholder's obligation to act. It creates a window for action by the first lienholder that begins with the date of the notice and ends 90 days later. That is inherent in the fact that the notice is called a "notice." The obvious purpose of the notice is to prompt action by the first lienholder.

As noted, the bank did not act within the 90-day period following the notice. This case, however, presents a slightly different question, which is whether the bank's earlier foreclosure action negated its obligation otherwise to act during that 90 days. For help with that question, we turn to the legislative history.

3.   *Legislative history*

What is now ORS 100.450(7) was originally enacted as section 19 of Senate Bill (SB) 1135 (1989). *See* Or Laws 1989, ch 595, § 19 (amending former ORS 94.195, renumbered that year as ORS 100.450). The bill had been proposed by the Oregon State Bar's Real Estate and Land Use Section. *See* Minutes, Senate Committee on Business, Housing and Finance, SB 1135, Apr 17, 1989, 7-8 (statement of Gene Grant, Oregon State Bar) (explaining that bill was being submitted by Bar's Real Estate Section and not Bar as a whole).

Section 19 was considered at least potentially the most controversial part of the bill, so it was the subject of extensive explanation by Rich Vial, the Chair of the Legislative Subcommittee of the Real Estate and Land Use Section. His explanation largely tracks the policy concerns that have been expressed nationally, as described above.

Vial explained that, as a matter of general policy, it was important for first lienholders to retain their priority, so that lenders would be willing to lend for condominium

purchases and resales.[7] At the same time, however, the members of a condominium association are economically interdependent when it comes to the payment of assessments. If one condominium owner is not paying those assessments, then the other condominium owners must pay more to make up the difference.[8]

Vial added that the Oregon legislature had previously considered whether to give condominium associations a super priority for unpaid condominium assessments, similar to that found in the Uniform Condominium Act. Lenders had opposed that solution, however, and the bill was defeated.[9]

Section 19 of SB 1135 reflected a compromise between condominium associations and lenders.[10] It was intended to

---

[7]   Mr. Vial stated:

"The priority of a first mortgage, of a prior recorded mortgage or trust deed, is something that most condominium associations recognize is important, to give lenders the comfort to make loans on condominiums in the first place, which is necessary for people to get resales. Everybody feels good about that."

Tape Recording, Senate Committee on Business, Housing and Finance, SB 1135, Apr 17, 1989, Tape 72, Side A.

[8]   Tape Recording, Senate Committee on Business, Housing and Finance, SB 1135, Apr 20, 1989, Tape 77, Side A (statement of Rich Vial) (noting the "hardship on the [other] unit owners, who must absorb the costs that aren't being paid by that unit owner").

[9]   Mr. Vial explained:

"[T]he reason why [section 19 is] controversial is that its birthplace was the Uniform Condominium Act, which has been adopted by about 24 states and does provide that the lien of a condominium association is prior to all other liens, including first mortgage and trust deeds of record. Now we, several sessions ago, in response to some concerns that had been raised by certain associations, thought that was a good idea. The lenders lobby reeducated us in that respect, we're grateful that they did, and we have come up with what we feel is not a super priority, but is a compromise that allows the association to protect itself in certain circumstances."

Tape Recording, Senate Committee on Business, Housing and Finance, SB 1135, Apr 17, 1989, Tape 72, Side A. *See also* Tape Recording, House Committee on Judiciary, Subcommittee on Civil and Judicial Administration, SB 1135, May 17, 1989, Tape 101, Side A (statement of Dave Barrows, representing the Oregon League of Financial Institutions) (noting that lenders' lobby had opposed prior legislation and committee had agreed with them).

[10] Mr. Vial stated that, "in talking with the lenders' lobby, we have come up with a compromise solution that we feel is good." Tape Recording, Senate Committee on Business, Housing and Finance, SB 1135, Apr 20, 1989, Tape 77, Side A. The lenders' lobby confirmed that. Dave Barrows, representing the Oregon

address a narrow situation: one in which a lender refused to initiate foreclosure because the value of the condominium was less than the amount of the debt, and so the lender was waiting for market prices to rise.[11]

Tanglewood notes that the legislative history confirms that the notice provision was to require the first lienholder to take some action after receiving the notice. A "Brief Section Summary" of the bill, submitted to the legislature by Rich Vial, stated:

> "Lender may retain priority by filing an action or taking other appropriate steps to enforce its lien rights if done within 90 days of receipt of the notice."

---

League of Financial Institutions and also speaking on behalf of Mr. Bronner of the Oregon Bankers Association, stated:

> "[Last session, w]e resisted strongly any movement of unpaid homeowners' assessments and fees ahead of our prior recorded mortgage ***. And the Housing Committee agreed with our position and that was not in the big package. We think this time we have worked out a reasonable position that will protect the interests of both the homeowners' associations and the lenders and the amendments that Mr. Vial has suggested to section 19 improve it even more. And we strongly endorse the bill and hope the subcommittee will send it to the full committee."

Tape Recording, House Committee on Judiciary, Subcommittee on Civil and Judicial Administration, SB 1135, May 17, 1989, Tape 101, Side A.

[11] Mr. Vial outlined the problem as follows:

> "The problem was this: The value of condominiums were going down, and have continued to go down unfortunately in this state. The person who got to the point where they couldn't keep up their assessments on their condominium unit frequently also couldn't pay their mortgagee. *** Now, had the mortgagee stepped in at that point and either foreclosed or taken a deed in lieu of foreclosure, there would have been no problem, because then we'd have a responsible party paying the assessments. But what happened, and what continues to happen ***, is that [the lender] won't take title to the unit. They stand back, and they wait until the value comes back up, so that if they foreclose or take title to the unit through a deed in lieu, and begin paying assessments, they're able to recover their mortgage in a sale, the value is there, they know they're not going to be sitting there paying the assessment for very long.

> "*** [W]hen the lender intentionally lets the unit sit vacant, or lets the defaulting owner stay there, *** does nothing about taking title, and the owner of the unit is judgment-proof—it's not going to do the association any good to try and collect from [the owner] because they're judgment proof—we've got nobody to look to to collect the assessments, and the entire financial cohesive structure of the condominium is impaired."

Tape Recording, Senate Committee on Business, Housing and Finance, SB 1135, Apr 17, 1989, Tape 72, Side A.

Testimony, Senate Committee on Business, Housing and Finance, SB 1135, Apr 17, 1989, Ex H, at 4.

The legislative history also shows that the purpose of the notice provision was to prompt an inactive first lienholder to start a foreclosure proceeding:

> "[I]f the lender takes a deed in lieu of foreclosure or initiates a foreclosure action or notices a trust deed sale during that period of time, their lien remains in first position. We've accomplished—that is, the association has accomplished—what it needed to, which is getting the process going, getting someone in there who can pay that assessment. That's the purpose for this section."

Tape Recording, Senate Committee on Business, Housing and Finance, SB 1135, Apr 20, 1989, Tape 77, Side A (statement of Rich Vial).

In an exchange at the same hearing, Mr. Vial confirmed that the notice was not intended to give condominium associations a "spur" to force first lienholders to speed existing foreclosure actions. The initiation of the foreclosure proceeding was enough, and condominium associations could protect their interests after that without aid from the notice provision:

> SEN. JIM BUNN: "Can a lender that does not want to foreclose because of the reasons you gave earlier simply initiate judicial proceedings and then back off * * * ?
>
> VIAL: "Once the judicial proceedings are initiated, then the condominium association has the opportunity to be involved in those proceedings and our feeling is that the association will have the ability to then push that along as quickly as they can. Certainly the possibility of a lender stretching that out may be there, but we're not concerned about that risk. We feel that this is sufficient at this time."

Tape Recording, Senate Committee on Business, Housing and Finance, SB 1135, Apr 20, 1989, Tape 77, Side A.

To put it another way: The legislation was drafted to address the situation in which a lender had not started foreclosure. The notice was intended to cause the first lienholder to take action to put the property into the hands of someone who would begin paying condominium assessments. The

statute was not expected to apply if the first lienholder had already taken one of the actions listed in ORS 100.450(7)(c).

4.  *Summary of text, context, and legislative history*

The text, context, and legislative history allow us to draw the following conclusions.

First, the general rule is that, unless ORS 100.450(7) applies, a first lienholder will retain its priority. That is specifically set out in ORS 100.450(1)(a) and confirmed by the legislative history.

Second, ORS 100.450(7) contemplates that the condominium association's notice (if the other requirements are met) will trigger a 90-day period for action by the first lienholder. The first lienholder must ordinarily take one of those actions within that 90-day period, or it will lose its priority to the lien for unpaid assessments.

Third, and relatedly, ORS 100.450(7)(c) assumes that the first lienholder has not taken any of the listed actions, which would lead to a new owner taking possession of the property. ORS 100.450(7)(c) requires the first lienholder to "initiate" a foreclosure action, implying that no foreclosure action is already pending, just as it requires a first lienholder with a deed of trust to "request issuance of a trustee's notice of sale," implying that no such notice has already been requested.

Fourth, the text, context, and history do not show any intent to "invalidate" or ignore a pending foreclosure action. To the contrary, the legislative history shows an affirmative expectation that a condominium association will be able to protect its interests adequately in a pending foreclosure proceeding, without any additional need to invoke ORS 100.450(7).

5.  *Application of principles to this case*

We now turn to how those principles should be applied on the facts of this case.

Factually, the relevant events are as follows. First, the bank had initiated a foreclosure action. Second, that foreclosure action was then dismissed. Third, while the

action was dismissed, Tanglewood gave notice under ORS 100.450(7). And fourth, the bank did not take any of the actions prescribed by ORS 100.450(7)(c) during the 90 days that followed.

As we have noted, the general rule is that the condominium association's notice puts the obligation on the first lienholder to act within 90 days to retain its priority. That general rule does not aid the bank.

In some cases, the first lienholder will already be acting under ORS 100.450(7)(c). It may have initiated a pending judicial foreclosure action, or it may have requested the issuance of a trustee's notice of sale, but the sale may not yet be complete.[12]

In those situations, a notice by the condominium association under ORS 100.450(7) will not be effective. The notice is given to prompt a particular set of actions. The legislative history confirms that there was no intent to allow a condominium association to use the notice provision to "force" the first lienholder to prosecute a foreclosure action faster. If a foreclosure action is pending, then the condominium association must protect its rights through the foreclosure proceeding, not through the mechanisms of ORS 100.450(7).

Here, however, the bank had filed a foreclosure action in the past, but that action was no longer pending when Tanglewood sent its notice. The action had been dismissed by general judgment.

Based on what we have said, we conclude that Tanglewood's notice was effective. Again, the purpose of the notice is to prompt a first lienholder to take action to get the condominium unit into the hands of an owner who can pay future assessments. A dismissed foreclosure action does nothing to promote that end. Moreover, there is no pending proceeding in which the condominium association could protect its interests.

---

[12] The third possible action under ORS 100.450(7)(c)—accepting a deed in lieu of foreclosure—is complete when performed, and thus cannot be "in process."

For purposes of ORS 100.450(7)(c), we conclude that a foreclosure action that has been filed and dismissed is functionally identical to a foreclosure action that was never filed.

That is the situation presented here. The conditions for ORS 100.450(7) (unpaid assessments and a default on the first lien) had been met. Tanglewood sent a proper notice under ORS 100.450(7), triggering the bank's obligation to take action. The bank did not act within 90 days, and it cannot rely on a foreclosure action that had previously been dismissed.

The bank argues that its action was later reinstated, and that reinstatement placed it back in the same position as if the action had never been dismissed. We do not agree. The foreclosure action had been filed and dismissed before Tanglewood ever sent its notice. The action remained dismissed until months after the 90-day notice period had expired. During that period, the action was closed by general judgment, and to all intents and purposes was a completed matter. Once the 90 days elapsed without the bank reinstating the then-dismissed foreclosure action, the statute expressly granted Tanglewood priority for its assessments.

The bank asserts that the reinstatement of the foreclosure action "undid" Tanglewood's statutory award of priority. But nothing about ORS 100.450(7) suggests that an existing grant of priority can be undone by the future actions of an adverse party. Nor does the bank identify any other statute, rule, or case that would support its conclusion.

The sole authority cited by the bank is the definition of "reinstate" from a legal dictionary:

> "To place again in a former state or position; to restore <the judge reinstated the judgment that had been vacated>."

*Black's Law Dictionary* 1539 (11th ed 2019). We agree that the bank's foreclosure action was restored. We do not agree, however, that the reinstatement made the dismissed foreclosure action pending during the 90-day notice period of ORS 100.450(7). The definition from *Black's* does not imply that the action was never dismissed, or that the period of dismissal was a legal nullity. The bank did not, for example,

obtain an order that the case was reinstated *nunc pro tunc*. Nor could it, as the bank does not dispute that the dismissal was legally correct at the time that it was entered. *See Gillespie v. Kononen*, 310 Or 272, 276 n 7, 797 P2d 361 (1990).[13]

We would add that, as an issue of real property law, there are notice issues that would give us pause before reaching any other conclusion. ORS 100.450(7)(f) requires a condominium association to record its notice with the county recording officer, the same as a lien. *See id.* (notice must be recorded same as in subsection (3) of statute); ORS 100.450(3) (notice "shall be recorded by the county recording officer" and "indexed as other liens are required by law to be indexed").

## III.   CONCLUSION

This case involves a complex policy choice by the legislature regarding when, and under what circumstances, a lien for condominium assessments should take priority over a first mortgage or deed of trust. We agree with Tanglewood that a condominium association's notice under ORS 100.450(7)(a) triggers an obligation on a first lienholder to act within 90 days, or the condominium association's lien will take priority. In this case, the bank did not act before the 90 days expired. Nor can the bank rely on its previously filed foreclosure action, as that action had been dismissed by general judgment prior to the notice, and it remained dismissed throughout the entire 90-day period. Once the 90 days elapsed without the case being reopened or a new

---

[13] As this court explained in that case:

"The function of a *nunc pro tunc* entry is to make a record of what was previously done, but not then entered; not to make an order now for then, but to enter now for then an order previously made. The purpose of a *nunc pro tunc* order is to supply an omission in the record of action actually taken but omitted from the record through inadvertence or mistake, or to enter an order which should have been made as a matter of course and as a legal duty. Such an order is effective only when it records a previously omitted truth—it does not create, but only speaks what has been done."

310 Or at 276 n 7 (citations omitted).

In so noting, we do not finally determine whether even a *nunc pro tunc* order reopening a foreclosure would be sufficient to avoid the priority granted by ORS 100.450(7).

foreclosure action being filed, Tanglewood was granted priority over the bank's interest by operation of ORS 100.450(7).

The decision of the Court of Appeals is reversed. The judgment of the circuit court is reversed, and the case is remanded to the circuit court for further proceedings.